# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JOSE NIEVES,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **V.** | : | **No. 3:06CV00198 (DJS)** |
| | : | |
| **AVALONBAY COMMUNITIES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OF DECISION

On January 9, 2006, plaintiff Jose Nieves ("Nieves") filed this action alleging that his employer, AvalonBay Communities, Inc. ("AvalonBay"), discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act, codified at 42 U.S.C. §§ 2000e et seq. In addition, Nieves asserts that AvalonBay discriminated against him because of his race, color, ethnicity, alienage, national origin and ancestry in violation of the Connecticut Fair Employment Practices Act ("CFEPA"). Nieves has also asserted claims for negligent supervision, intentional infliction of emotional distress, wrongful termination, and violation of Section 31-51q of the Connecticut General Statutes ("Conn. Gen. Stat."). On March 1, 2007, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), AvalonBay filed a motion for summary judgment (dkt. # 21) on all counts of Nieves's complaint. For the reasons set forth herein AvalonBay's motion **(dkt. # 21)** is **GRANTED.**

## I. FACTS

Nieves is a Hispanic male who was born in Puerto Rico. AvalonBay develops and manages apartment communities throughout the United States. Prior to his employment at

1

AvalonBay, Nieves interviewed with Oscar Morales ("Morales"),[1] the then Assistant

Community Manager, for the position of Maintenance Technician I. (See dkt. # 32, Ex. 1,

Nieves Dep. at 19:16-18.) Nieves testified that, in addition to interviewing with Morales, he

interviewed with someone else on the phone. (See id. at 19:21-23.) Morales sent to Nieves an

offer of employment letter, dated July 8, 2002. Nieves began working for AvalonBay on or

about July 15, 2002.

      While Nieves was employed at AvalonBay he worked at Avalon Grove, an apartment

community located in Stamford, Connecticut, which is owned by AvalonBay.[2] The parties do

not dispute that Morales was Nieves's direct supervisor. (See id. at 24:5-10; dkt. # 22, Ex. B.)

During his tenure at Avalon Grove, Nieves was promoted from the position of Maintenance

Technician I to the post of Maintenance Technician II.[3] Even though he was ultimately

promoted to the post of Maintenance II, Nieves argues that AvalonBay tried to block him from

obtaining the position by advertising for the position outside of the company, not notifying him

of the opening, and initially ignoring his requests to apply for the position. Indeed, he argues

that these actions were the result of discriminatory animus on the part of his supervisors. He

testified that "one of the vacant [positions] was for Tech II and [sic] [for] which I was trying to

get that position, you know, [and for] which [AvalonBay] is giving me a little hard time to get

that position because they [AvalonBay] don't want for some reason [to] grant it to me." (Dkt. #

32, Ex. 1, Nieves Dep. at 28:14-18.) He further asserted that "they never [sic] tell me the

_____

[1]Nieves admits that Morales is a Hispanic male.

[2]AvalonBay employs approximately 80 to 100 individuals in Stamford.

[3]Nieves received pay increases while employed by AvalonBay. As part of his compensation, Nieves also
received discounted housing at Avalon Grove.

[Maintenance Technician II] position is open . . . they never tell me if I want the position." (Id. at 29:4-5.)

The parties, however, agree that Nieves was ultimately promoted. Nieves provided deposition testimony that Morales and Elizabeth Lagasse ("Lagasse"),[4] the Portfolio Manager with responsibility for Avalon Grove, were involved in the decision to promote him to the post of Maintenance Technician II. (See id. at 44:10-18.) He further testified that one of his supervisors, Jaime Menagazzo ("Menagazzo") told him that he was being promoted. (See id. at 43:16-21.)

While at AvalonBay, Nieves was responsible for providing general maintenance to the apartment community and responding to requests for maintenance at apartments and facility common areas. It is undisputed that Nieves had a good employment record and did not encounter disciplinary problems until the fall of 2004. It is further undisputed that, as an AvalonBay employee, Nieves was required to read and understand AvalonBay's Code of Conduct ("the Code of Conduct") and the Associate Handbook ("the Handbook"). Although Nieves argues that his first language is Spanish and that he has trouble reading English (see id., Pl. Opp.'n to Def.'s Mot. for Summ. J.), Nieves provided deposition testimony that he had read both the Code of Conduct and the Handbook (see id., Ex. 1 Nieves Dep. at 35:5-36:6.) Nieves further admits that he signed "Associate Acknowledgments" certifying that he had read and understood the Code of Conduct and the Handbook from 2002 until 2004. (See dkt. # 32-2, Pl. Local Rule 56(a)(2) Statement ¶ 5-6; dkt. # 22, Exs. C, D.) Section 7-04 of the Handbook obligates employees to cooperate fully with AvalonBay's management during internal

---

[4]The parties agree that Lagasse was the Portfolio Manager with responsibility for Avalon Grove when Nieves was hired as well as when he was discharged.

investigations.  (See dkt. # 22, Ex. E.)  Indeed, that section provides in pertinent part, "[f]rom time to time, the company may be required to conduct internal investigations pertaining to security, auditing or work-related matters. You are expected to cooperate fully with and assist in investigations if requested to do so."  (Id.)

In September 2004, Nieves was injured in a motor vehicle accident while leaving work. After returning to work from his injuries, Nieves felt that he was being penalized for his inability to do heavy work.  Specifically, he believed that Menagazzo was particularly unaccommodating to his injuries.  For instance, he asserts that Menagazzo implied to him that he was unhappy about the accident and the impact that it had on his employment.  In addition, Nieves recalls an occasion where he felt wrongfully blamed by Menagazzo for damaging a machine that he had been using.  Nieves further complains that Menagazzo was "abrupt" with other employees and himself.  (See dkt. # 32, Nieves Dep. at 118:6-22.)  According to Nieves, Menagazzo was the only person with whom he had a problem with.  Nieves believed that Menagazzo had been improperly trained and supervised by AvalonBay.  (See id. at 120:7-15.)  Nieves further states "we had some words, but we never had no problems like we had to confront each other."  (Id. at 118:19-22.)

Nieves often voiced his work-related concerns at staff meetings.  These concerns included: the training of Menagazzo; the mishandling of an incident where plants were stolen from the front of the community office; and the leaving of a gate open overnight.  (See id. at 123:9-126:9.)  According to Nieves, he spoke to Morales about Menagazzo, the plant incident, and the open gate.  Nieves testified that Morales responded to his comments by threatening, "I'm going to take your badge out [sic] of you.  I'm going to take your radio off you.  I'm going to take your uniform off you."  (Id. at 112:8-20.)  Nieves further claims that he spoke to Katherine

Meyer ("Meyer"), the then Regional Human Resources Manager for AvalonBay, about Menagazzo and the open gate. Nieves's deposition testimony is silent as to whether he discussed these concerns with Lagasse. Lagasse asserts that she was unaware of these conversations. In fact, she states, "I understand that Mr. Nieves claims he made certain complaints to Ms. Meyer during his meetings with her. If so, Ms. Meyer did not convey that information to me and it was not a factor in my decision." (Dkt. # 22, Lagasse Decl. ¶ 9.)

On October 14, 2004, employees of Avalon Grove, including Nieves, were invited to a conference room to celebrate Lagasse's birthday and share birthday cake. The cake was served at approximately 3:00 p.m. That day, some time between approximately 1:00 p.m. and 3:00 p.m., the tires belonging to the cars of several employees, which were parked in the employee lot, were punctured.[5] The parties agree that an employee access card was necessary to access the employee lot where this incident took place, that occasionally this lot was left open, and that this area was accessible by both employees and residents. (See dkt. # 32, Ex. 1, Nieves Dep. at 94:14-18.) Nieves's tires were not damaged during the incident of October 14, 2004; however, two days later, on October 16, 2004, there was another incident of vandalism during which the tires of another employee's car and the tires on Nieves's car were damaged.

Following the second incident of vandalism, AvalonBay launched an investigation to find the individual or individuals responsible for the tire slashing incidents. Meyer was placed in charge of the investigation. The time period between 1:00 p.m. and 3:00 p.m. on October 14, 2004 was a critical focus of the investigation and believed, by Meyer, to be when the first

---

[5]Nieves provided deposition testimony that Avalon Grove employees and residents parked in separate lots.

incident of vandalism was perpetrated.  Meyer began her investigation by interviewing Avalon Grove employees, including Nieves.

On or about October 27, 2004, Nieves met with Meyer to discuss the incidents of vandalism.  (See id. at 103:1-5.)  Meyer questioned Nieves about, inter alia, his whereabouts during the time frame when the first incident of vandalism was believed to have occurred. Nieves was aware of the reason for the meeting and considered himself a suspect from the outset, due to the manner in which Meyer was questioning him.  (See id. at 98:4-7.)  Nieves maintains that he was not responsible for the damage to the tires and asserts that AvalonBay should have had the police investigate the incidents.  He further argues that AvalonBay should have looked into the possibility of a disgruntled resident slashing the tires.

When Meyer asked Nieves about his whereabouts on the day of the first tire slashing incident, Nieves responded that he was in an unspecified apartment from 1:00 p.m. to 3:00 p.m. with another employee named Reyna. (See id. at 99:7-100:14; dkt. # 22, Ex. H.)  Although Nieves did not specify whether he traveled between buildings or other locations during this time period, he states that he also did not tell Meyer that he remained in the apartment the entire time. Nieves provided the following deposition testimony regarding his whereabouts:

Q. Okay.  And did you tell her [Meyers] what apartment you'd been working in?

A. Not in the specific apartment, but I told her I was working in the certain apartment there.

Q. Okay.  And did you tell her you were with anyone?

A. A girl, another girl that worked with me in the apartment.

Q. And who was that girl?

A. That girl is Reyna.  I forgot her last name.

(Dkt. # 32, Ex. 1, Nieves Dep. at 100:3-13.)  Subsequent to Nieves's interview with Meyer, available video surveillance footage was discovered by AvalonBay, which showed Nieves traveling between buildings on October 14, 2004, between 1:00 p.m. and 3:00 p.m.  (See dkt. # 22, Ex. G.)  This footage placed Nieves outside of the apartment he claimed to be in and contradicted the statements he made to Meyer during their meeting.  Nieves admits that, as an employee performing his work duties, it would be likely that he would be walking around the parking lot, (see dkt. # 32; Nieves Dep. at 109:13-110:11); however, he points out that AvalonBay has never produced a copy of the videotape footage.  He further asserts that his regular work duties included his potential travel between buildings and access to the work shop via the parking lot where the vandalism took place.

The parties do not dispute that Reyna, who Nieves claimed he had been working with on October 14, 2004, did not confirm that he was in the apartment building between the hours of 1:00 p.m. and 3:00 p.m.  (See dkt. # 22, Ex. H.)  After discovering that Nieves could not corroborate his whereabouts during the critical time period during the first incident of vandalism, Meyer and Morales concluded that Nieves had failed to cooperate with the investigation.  Meyer and Morales recommended that Nieves be discharged for his failure to cooperate during the internal investigation as outlined in the Handbook.  This recommendation was made to Lagasse who thereafter approved Nieves's discharge.  With respect to Morales's involvement, Nieves stated in his deposition, "he was the one who recommend[ed] or call[ed] Mrs. Meyer to make the process of discharge or something."  (Dkt. # 32, Ex. 1, Nieves Dep. at 112:16-20.)

On November 1, 2004, Meyer and Morales met with Nieves to inform him of his discharge.  They informed Nieves that he was being discharged for "misconduct" and because he

"lied about where he was" on October 14, 2007.  (See dkt. # 22, Ex. F.)    Nieves provided the

following description of the meeting:

> Q.    Okay. Tell me what happened during the meeting?
>
> A.    Well, I was working like a normal day. And then by the end of the day, they
> called me in a room like this, just Ms. Meyer just simple come in, told me
> according to investigation we did the other day or this day, we found--we found
> that you was lying and you wasn't truthful here and there, so you don't have no
> more job with us. That was simple as that.

(Dkt. # 32, Ex. 1, Nieves Dep. at 85:13-22.)  He further testified,

> Q.    And what did they tell you was the reason that you were being
> discharged?
>
> A.    Because in the vandalized cars investigation, she [Meyer] did – she
> [Meyer] found that I wasn't truthful and that some guys see me walking
> around the parking lot that made me like a suspect of the issues.

(Id. at 87:11-17.)  Although Nieves argues that Meyer did all of the talking, he also provided the

following testimony,

> A.    They [Morales and Meyer] was [sic] talking in different tone.  Like in
> some cases she was smiling in front of me, that nothing else we can do,
> this and that.  Just the only one was more quiet, it was Mr. Morales.  She
> was more - - how I going to explain you? - - active and voice change and
> sometimes like probably laughing . . . .

(Id. at 86:14-20.)

Nieves asserts that AvalonBay terminated him because he is Puerto Rican.   He also

appears to offer contradictory reasons for his termination.  For instance, Nieves argues that he

was terminated because his supervisors believed that he was the one who slashed the tires. (See

id. at 110:12-18.)  With respect to his termination, Nieves also provided the following deposition

testimony,

> Q.    Okay. And you've - - In your mind as you sit here today, besides this - -
> you know, what you were told by the company, is there any other reason

that you think they fired you other than what you said?

A.      Could be many.

(Id. at 113:11-16.)  The "many" reasons Nieves refers to throughout his deposition are: the incidents of vandalism; his outspoken nature at meetings; his age; his gender; and his race.[6] Nieves further states that he believes he was discharged because he was a suspect in the investigation and because he was on a restricted work duty due to his accident of 2004.

To support his claim that racial discrimination played a role in his termination, Nieves argues that the supervisors in charge of hiring and firing him, Lagasse, Meyer, and Charles Moore ("Moore"),[7] were not Hispanic.  He also testified that, at the time of his discharge, AvalonBay was terminating a large number of Hispanics.  Indeed, Nieves gives the following testimony regarding the targeting and dismissal of Hispanic employees:

Q.      Well, who were the - - to your knowledge, the other Hispanic males who had been fired around the same time you were?

A.      But not in same building.

Q.      Okay, none of them, okay.

A.      Okay.

Q.      Go ahead.

A.      I don't have those names with me right now.

Q.      Well do you know which building?

---

[6]In his Complaint, Nieves does not assert an age or gender discrimination claim.  (See dkt. # 1.)  Moreover, there is no evidence that Nieves has exhausted his administrative remedies by asserting an age or gender discrimination claim before the CHRO or the EEOC.  As such, the court shall not consider the merits of these claims.

[7]Nieves, in is Local Rule 56(a) Statement, asserts that Moore interviewed him and participated in the decision to hire him.  The record is silent as to what position Moore held.

A.    The building is Avalon Harbor, was a few guys was terminated there. And
      before Avalon Grove, a bunch of guys was terminated in Avalon
      Bedford.[8]

Q.    Okay.  Any others?

A.    And as I hear, somebody was fired from Avalon Glen, which is here in
      Glenbrook Road or something like that.

Q.    Any others?

A.    Not to my knowledge, no.

Q.    Did you know any of these individuals who were fired?

A.    By the way, one of them he got my same last name.  He's Nieves,
      Bernardo Nieves.

(Id. at 128:25-129:24.)  Despite this testimony, Nieves admits that he does not know the names

of a majority of the group of Hispanic employees who were allegedly discharged, did not know

them personally, and did not know their nationality.  (See dkt. # 32-2, Pl. Local Rule 56(a)(2)

Statement ¶ 34.)

        AvalonBay has offered evidence showing that from 2002 to the present, all but one

member of the maintenance department were Hispanic.  Nieves does not dispute this evidence.

(See id. at ¶ 27; dkt. # 22, Lagasse Decl. ¶ 2.)  Nieves also does not dispute AvalonBay's

assertion that he was replaced by Norma Lopez ("Lopez"), a Hispanic female.  Indeed, Nieves

himself testified that he was replaced by Lopez.  (See dkt. # 32, Ex. 1, Nieves Dep. at 32:19-25.)

        On November 6, 2004, Nieves filed for unemployment.  A fact finding report with the

Connecticut Department of Labor ("DOL"), entitled, "Claimant Statement in Connecticut

Department of Labor's Fact Finding Report" (the "Fact Finding Report"), (see dkt. # 22, Ex. H),

indicates that Nieves stated, "I did inform them during the investigation process that I was

_____
        [8]Avalon Harbor, Avalon Bedford, and Avalon Glen are all apartment communities owned by AvalonBay.

working in the apartment from 1:00 p.m. to 3:00 p.m." Nieves was asked about the Fact Finding Report at his deposition.[9] When he was asked "[C]an you read through [the Fact Finding Report] and tell me if you think this accurately states what you told Mr. Rivera or the person from Unemployment back in November of 2004?" Nieves responded "Yes." (Dkt. # 32, Ex. I, Nieves Dep. at 84:13-17.) In addition, when Nieves was asked, "[And] is everything that you told him that's in the statement true?" Nieves responded, "Yes." (Id. at 84:21-23.)

On April 27, 2005, Nieves filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), (see dkt. # 22, Ex. J.), which alleged that AvalonBay was terminating a large amount of Hispanic workers. Nieves further alleged that his race, color, ethnicity, national origin, alienage and ancestry played a part in AvalonBay's decision to terminate him. On September 22, 2005, the CHRO issued a Merit Assessment Review concluding that there was "no reasonable possibility" that further investigation of the charge would result in a finding of reasonable cause that discrimination occurred. (See id., Ex. L.)

## II. DISCUSSION

Nieves, in his Complaint, alleges that AvalonBay discriminated against him because of his race, color, ethnicity, national origin, alienage, and ancestry in violation of the CFEPA (Count One) and Title VII (Count Two). Nieves further brings the following causes of action against AvalonBay, all of which are grounded in Connecticut law: negligent supervision (Count Three); intentional infliction of emotional distress (Count Four); wrongful termination (Count Five); and violation Conn. Gen. Stat. § 31-51q (Count Six). Pursuant to Fed. R. Civ. P. 56(b), AvalonBay has moved for summary judgment on all counts of Nieves's Complaint.

_____

[9] No mention of discrimination was mentioned in the report with the DOL.

## A.  STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

## B.  DISCRIMINATION CLAIMS

Nieves argues that AvalonBay discriminated against him because of his race, color, ethnicity, national origin, alienage, and ancestry in violation of Title VII and CFEPA.  Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee on the basis of an employee's race or color.  42 U.S.C. §§ 2000e et seq.  The CFEPA also makes it unlawful for employers to discriminate against their employees because of race,

color, ethnicity, national origin, alienage, and ancestry. Conn. Gen. Stat. § 46a-60. The Connecticut Supreme Court looks to federal precedent for interpreting and enforcing the CFEPA. Levy v. Comm'n of Human Rights and Opportunities, 236 Conn. 96, 103 (1996); Brittell v. Dep't of Cor., 247 Conn. 148 (1998). As discrimination claims brought under the CFEPA are analyzed under the same framework as Title VII claims, the court shall analyze Nieves's CFEPA and Title VII claims together.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases. Under that framework, a plaintiff alleging a violation of the discrimination statutes establishes a prima facie case by showing he (1) was a member of a protected class; (2) was qualified for the position he held; (3) suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination." Schnabel v. Abramson, 232 F. 3d 83, 87 (2d Cir. 2000); see Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1985). If the plaintiff establishes a prima facie case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action. Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination. See id.

Nieves cannot, as a matter of law, establish that AvalonBay's actions were the product of illegal discrimination.[10] The ultimate question in an employment discrimination case is whether

---

[10]The parties do not dispute that Nieves satisfied the first three prongs of the prima facie case. Rather, AvalonBay contends that because Nieves has not produced sufficient evidence to give rise to an inference of discrimination, he cannot establish a prima facie case of discrimination. Since Nieves's burden when attempting to make out a prima facie case is de minimis, see McDonnell Douglas Corp., 411 U.S. at 802, the court shall assume arguendo that Nieves has established a prima facie case of discrimination.

the evidence offered can reasonably and logically give rise to an inference of discrimination under all of the circumstances.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000); Bickckerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

Here, Nieves has not submitted sufficient evidence in support of his claim of discrimination.  AvalonBay has offered substantial evidence that it terminated Nieves's employment for a legitimate, nondiscriminatory reason.[11]  Specifically, AvalonBay has proffered evidence showing that it discharged Nieves because he violated Section 7-04 of the Handbook by misleading Meyer during an internal investigation.  It further offers the Fact Finding Report, (see dkt. # 22, Ex. H), in which Nieves stated, "I did inform them during the investigation process that I was working in the apartment from 1:00 p.m. to 3:00 p.m," as well as evidence indicating that Nieves may have left the apartment during the time in question.  AvalonBay also offers Nieves's deposition testimony regarding the Fact Finding Report.  When he was asked "[C]an you read through [the Fact Finding Report] and tell me if you think this accurately states what you told Mr. Rivera or the person from Unemployment back in November of 2004?"  he responded "Yes."  (Dkt. # 32,  Ex.  I, Nieves Dep. at 84:13-17.)  In addition, when Nieves was asked, "[And] is everything that you told him that's in the statement true?" Nieves responded, "Yes."  (Id. at 84:21-23.)  This offer of proof is sufficient to satisfy AvalonBay's burden at this stage in the analysis.  See Reeves, 530 U.S. at 142 ("the burden is one of production, not persuasion").

AvalonBay's specific and substantiated proffer forces Nieves to counter with evidence of pretext in order to prove discrimination.  Although Nieves admits that Meyer told him that he

---

[11]AvalonBay also advances a second legitimate, nondiscriminatory reason for Nieves's discharge.  It argues that it terminated Nieves because he was an employee at will.

was being discharged because Meyer "found that I wasn't truthful [in the vandalized car investigation]," (see dkt. # 22, Ex. I, Nieves Dep. at 87:11-17), he argues that AvalonBay falsely and inaccurately accused him of giving false information during the investigation and implied that he had something to do with the vandalism. In support of this argument, Nieves argues that he never told Meyer that he had remained in the apartment the entire time. He also offers his deposition testimony whereby he testified that his duties as a Maintenance Technician II often required him to walk around the premises and that, on the date of the first tire slashing, he had gone to the garage and walked around the property. (See id. at 108:21-25.) Lastly, he argues that although AvalonBay relies upon the purported video footage of Nieves leaving the apartment, AvalonBay has never produced the alleged video footage.

Even when viewed in the light most favorable to Nieves, his assertions do not, as a matter of law, establish pretext. It is well established that absent discrimination, an employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all." Mohamed v. Marriott Int'l, Inc., 905 F. Supp. 141, 155 (S.D.N.Y. 1995) (quoting Nix v. WLCY Radio/Radhall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)). Indeed, "[a]n employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." Droutman v. New York Blood Ctr., No. 03-CV-5384 (DRH/ARL), 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005) (emphasis in original); see Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) (finding that "even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status."). Here, Nieves has failed to adduce evidence

showing that he told Meyer that he left the apartment. He has also failed to adduce evidence showing that the decision-makers, i.e., Morales, Meyer, and Lagasse, did not believe that he violated Section 7-04 of the Handbook by failing to fully cooperate and respond to Meyer's questions. See Holocheck v. Luzerne County Head Start, Inc., No. 3:CV-04-2082, 2007 WL 954308, at *9 (M.D. Pa. Mar. 28, 2007). Nor has he shown that their decision to dismiss him was influenced by his membership in a protected class. As such he has not created a genuine issue of material fact with respect to pretext.

Even assuming that Nieves could establish pretext, which he has not, Nieves has not adduced any evidence showing that race discrimination played a role in AvalonBay's decision to terminate him. Nieves advances four arguments in support of his claim that race discrimination influenced AvalonBay's decision to terminate him. First, he argues that AvalonBay terminated an inordinate number of Hispanics at the time he was discharged. Second, he argues that an inference of race discrimination can be drawn from his supervisors' efforts to block him from obtaining the Maintenance Technician II position. Third, he argues that Meyer, and not Morales, fired him. Fourth, he argues that the individuals involved in his termination were not Hispanic. These claims, even when viewed in the light most favorable to Nieves and taken in the aggregate, do not support Nieves's claim that racial discrimination played a part in his termination.

Although Nieves testified that he was one of an "inordinate number" of Hispanics who were terminated from AvalonBay, Nieves, during his deposition, was only able to produce the full name of one Hispanic employee who was terminated. Even then, Nieves was unable to produce any facts regarding the reason for this employee's termination. (See dkt. # 32, Ex. 1, Nieves Dep. at 128:16-132:14.) Such conclusory allegations are not enough to survive a motion

a for summary judgment. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("When, however, a party moves for summary judgment, and documents his motions, setting forth specific facts denying the claims, the opposing party must, set forth specific facts that there is a genuine issue for trial. Mere conclusory allegations or denials will not suffice.") (internal quotations omitted); Hawana v. City of New York, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) ("[P]laintiff's personal conclusory assumptions are insufficient to support . . . an [inference of discrimination]."); Little v. New York, 96 Civ. 5132, 1998 WL 306545, at *6 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn. . . . Accordingly, a Tittle VII plaintiff cannot defeat a motion for summary judgment by offering purely conclusory allegations of discrimination.") (internal quotations and citations omitted), aff'd 173 F.3d 845 (2d Cir. 1999). Moreover, in addition to failing to adduce evidence tending to show that AvalonBay terminated other Hispanics during the same time period that Nieves was terminated, Nieves did not identify any other Hispanic employees that were discharged from the apartment complex at which he worked, Avalon Grove. Thus, Nieves's failure to point to specific facts supporting his claim that he was one of an inordinate number of Hispanics terminated precludes an inference of discrimination to be drawn.

In further support of his race discrimination claim, Nieves asserts that AvalonBay's past efforts to block him from obtaining the post of Maintenance II Technician raise an inference of discrimination. Nieves's argument fails for two reasons. First, Nieves admits that he was promoted to the post of Maintenance Technician II and that Morales and Lagasse were involved in this decision. Thus, any suggestion that Morales and Lagasse were discriminating against

17

plaintiff, by failing to promote him, is severely diminished by the fact that they ultimately promoted him to the post of Maintenance Technician II. Second, Nieves has failed to show how race played any role whatsoever in him having a "hard time to get that position," (see dkt. # 32, Ex. 1, Nieves Dep. at 28:14-18,) because "they never [sic] tell me the [Maintenance II] position is open [and] . . . they never [sic] tell me if I want the position." (Id. at 29:4-5.) Cf. Jugueta v. Perry, No. 95 Civ. 10303(DC) , 1997 WL 742535, at *5 (S.D.N.Y. Dec. 1, 1997) (no inference of discrimination derived from plaintiff's allegation of denials of prior positions where plaintiff's allegations were merely conclusory, plaintiff offered no evidence that he was more qualified than the individuals selected for the prior positions, and plaintiff offered no evidence to show that he was not selected for these prior positions because of race or national origin). Here, other than asserting that it was his belief that his superiors were engaging in racial discrimination by making it hard for him to be promoted, Nieves offers no evidence in support of this claim. He offers no evidence as to who was responsible for advertising the position or informing him of the opening. Moreover, he admits that two of the supervisors he accuses of engaging in race discrimination, by making it difficult for him to be promoted, were the ones who decided to promote him.

Nieves argues that Morales played no role in his termination because, Meyer, and not Morales did all of the talking during the meeting of November 1, 2004. Despite this claim, Nieves provided the following testimony,

A.	They [Morales and Meyer] [sic] was talking in different tone. Like in some cases she was smiling in front of me, that nothing else we can do, this and that. Just the only one was more quiet, it was Mr. Morales. She [Meyer] was more - - how I going to explain you? - - active and voice change and sometimes like probably laughing . . . .

(Dkt. # 32, Ex. 1, Nieves Dep. at 86:14-20.)  Nieves does not assert that Meyer made any racially derogatory comments.  Rather, he argues that an inference of discrimination can be drawn from Meyer's tone and facial expressions.  Where, as here, it is undisputed that nearly the entire maintenance department was Hispanic and that there is no evidence that Meyer or Morales were singling out Nieves because of his background, the mere fact an employee does not like his supervisor's tone is not indicative of racial discrimination.

Next, Nieves argues that an inference of race discrimination can be drawn from the fact that the supervisors in charge of hiring and firing him, Lagasse, Meyer, and Charles Moore, were not Hispanic.  AvalonBay counters that Morales, a Hispanic male who was Nieves's direct supervisor, was involved in the decisions to hire and fire Nieves, (see id. at 24:5-10; 112:16-20; dkt. # 22, Ex. B), and that this fact strongly suggests that "invidious discrimination was unlikely." Schnabel, 232 F. 3d at 91; see Grady v. Affiliated Ctr., Inc., 130 F. 3d 553, 560 (2d Cir. 1997) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with decision to hire.").  As an initial matter, the court observes that Nieves's argument that Morales played no role in the termination process appears to contradict his own deposition testimony because Nieves testified that Morales "was the one who recommend[ed] or call[ed] Mrs. Meyer to [sic] make the process of discharge . . . ."  (Dkt. # 32, Ex. 1, Nieves Dep. at 112:16-20.)  In addition, Nieves concedes that Morales was present at the meeting of November 1, 2004, in which Meyer told Nieves that he was being terminated.  Even assuming that Morales was not involved in the discharge decision-making process and that it was Lagasse, Meyer, and Moore who made the decision, Nieves has not satisfied his burden.  Indeed, he has offered no evidence showing that they targeted him because he was Hispanic or that they treated

19

him differently from other AvalonBay employees. Nor has he offered evidence showing that they treated other Hispanic employees in a disparaging manner. <u>Cf.</u> <u>Schnabel</u>, 232 F. 3d at 88 ("In fact beyond the minimal proof required to state a <u>prima</u> <u>facie</u> case, Schnabel has offered no evidence that he was discriminated against because of his age."). Moreover, Nieves admits that the same individuals he accused of firing him because he was Hispanic also decided to replace him with a Hispanic female. "[A] replacement within the same protected class cuts strongly against any inference of discrimination," <u>Jock v. Ransom</u>, No. 7:05-cv-1108, 2007 WL 1879717, at *5 (N.D.N.Y. June 28, 2007) (quoting <u>Murray v. Gilmore</u>, 406 F.3d 708, 715 (D.C. Cir. 2005); <u>see</u> <u>Montanile v. Nat'l Broad. Co.</u>, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination."). Thus, the court concludes that AvalonBay's undisputed evidence that Nieves was replaced by a Hispanic worker and that nearly the entire maintenance department at Avalon Grove was Hispanic strongly cuts against Nieves's argument that discriminatory animus played a role in his termination.

Lastly, the court observes that Nieves himself provided contradictory deposition testimony when he stated that he believed there could have been "many" reasons other than race discrimination behind AvalonBay's decision to terminate his employment. (<u>See</u> dkt. # 32, Ex. 1, Nieves Dep. at 110:12-18;113:11-16.) In consideration of all of the evidence offered, Nieves's claim fails as a matter of law, because his evidence is insufficient to establish pretext or give rise to an inference of discrimination. Therefore, there is no genuine issue of material fact for the jury to decide and AvalonBay's motion must be **GRANTED** with respect to these claims.

## C.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Nieves argues that as a result of the actions of the defendant, he suffered severe emotional distress, requiring medical treatment and medication.  Intentional infliction of emotional distress is a tort under Connecticut common law. The Connecticut Supreme Court has stated that in order to recover damages on a claim of intentional infliction of emotional distress the plaintiff must show:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

Petyan v. Ellis, 200 Conn. 243, 253 (1986), superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp., 272 Conn. 776 (2005).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."  Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000).  "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Id. at 210-11 (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)).  The conduct must be of a  "nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."  Ancona v. Manafort Bros., Inc., 56 Conn. App. 701, 712 (2000).  Thus, Connecticut courts have held that "insults, verbal taunts, threats, indignities, annoyances, petty oppressions, or conduct that displays bad manners or results in hurt feelings, do not support a claim for intentional infliction of emotional distress."  Miner v. Town of Cheshire, 126 F. Supp.

2d 184, 195 (D. Conn. 2000) (citations omitted)  "Mere conclusory allegations are insufficient to support a cause of action for this tort."  Nucifora v. Bridgeport Bd. of Educ., 188 F. Supp. 2d 197, 206  (D. Conn. 2001) (citing Huff v. West Haven Bd. of Educ., 10 F. Supp. 2d 117, 122 (D. Conn. 1998)).

Further, when the defendant is an employer, the court look's to the employer's conduct, not the motive behind the conduct, to determine if it was extreme and outrageous.  Miner, 126 F. Supp. 2d at 195.  Thus, "[a]n employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner."  Id.

Applying these principles, the court finds that Nieves has not shown that any of the employment actions taken by defendants were done in a manner so egregious or oppressive as to rise to the level of extreme and outrageous.  Defendant's motivation for terminating plaintiff is not relevant, and the termination in and of itself cannot constitute extreme and outrageous behavior.  See Armstead v. Stop & Shop Cos., No. 3:01 CV 1489(JBA), 2003 WL 1343245, at *5 (D. Conn. Mar. 17, 2003) (observing that "claims of employer misconduct in the form of intentional discrimination or retaliation, including discharge, which challenge motive or intent, are dismissed unless the manifesting conduct is itself outrageous or extreme."); Thompson v. Serv. Merc., Inc., No. 3:96CV1602(GLG), 1998 WL 559735, at *2 (D. Conn. Aug. 11, 1998) (granting motion for summary judgment and finding that allegations made by plaintiff of employer downgrading her race, removing her responsibilities in order to undermine her authority, and failing to provide adequate supervision and sufficient staff to do her job, did not constitute extreme and outrageous conduct).  In addition, Morales's threat that we was going to

strip Nieves of his badge, radio, and uniform (see dkt. # 32, Ex. 1, Nieves Dep. at 112:8-20),

does not qualify as going beyond all possible bounds of decency in a civilized community.  See

Miner, 126 F. Supp. 2d at 195 ("insults, verbal taunts, threats, indignities, annoyances, petty

oppressions, or conduct that displays bad manners or results in hurt feelings, do not support a

claim for intentional infliction of emotional distress.") (citations omitted).  Next, Nieves has

failed to offer any evidence showing that AvalonBay informed other employees that it was

Nieves who slashed the tires.  Lastly, Nieves's claim that his termination was extreme and

outrageous because it resulted in him losing the right to a discounted rent, which caused him to

lose his apartment at Avalon Grove, fails because Nieves has not offered any evidence as to

whether he was evicted, when he lost the apartment, whether AvalonBay forced him out of the

apartment, and how long he had to vacate the apartment.  Thus, AvalonBay is entitled to

judgment as a matter of law on Nieves's intentional infliction of emotional distress claim.[12]

### D.  NEGLIGENT SUPERVISION

The court finds that Nieves has abandoned his common law claim of negligent

supervision.   "Federal courts may deem a claim abandoned when a party moves for summary

judgment on one ground and the party opposing summary judgment fails to address the

argument in any way."  Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003);

see Barlow v. Connecticut, 319 F. Supp. 2d 250, 266-67 (D. Conn. 2004); Bronx Chrysler

Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing one of

the plaintiff's claims as "abandoned" where the plaintiff's summary judgment opposition papers

"made no argument in support of [that] claim at all").  Although AvalonBay has moved for

---

[12]The court further finds that Nieves's intentional infliction of emotional distress claim fails because he has not raised a genuine issue of material fact with respect to the first element.  Indeed, when he was asked "Is there anyone at Avalon you believe was intentionally trying to get you upset?" he responded "Not to my knowledge." (Dkt. # 32, Ex. 1, Nieves Dep. at 121:24-122:1.)

summary judgment on all counts of Nieves's Complaint (see dkt. # 21), a review of the argument

section of Nieves's memorandum of law in opposition to defendant's motion for summary

judgment reveals that there is no legal discussion regarding Nieves's claim of negligent

supervision (Court Three). Because Nieves does not address his negligent supervision claim in

his "Memorandum in Opposition to Defendant's Motion for Summary Judgment," (see dkt. #

32), the court shall deem it abandoned.  As such, AvalonBay is entitled to summary judgment on

this claim.

Alternatively, the court finds that Nieves's "belief" that Menagazzo improperly trained

and supervised him is not enough, as a matter of Connecticut law, to set forth a claim of

negligent supervision.  Connecticut law requires that a plaintiff bringing a negligent supervision

claim to

> [p]lead and prove that he suffered an injury due to the defendant's failure to
> supervise an employee whom the defendant had a duty to supervise. A defendant
> does not owe a duty of care to protect a plaintiff from another employee's tortious
> acts unless the defendant knew or reasonable should have known of the
> employee's propensity to engage in that type of tortious conduct.

Abbate v. Circuit-Wise, Inc., 130 F. Supp. 2d 341, 344 (D. Conn. 2001).  Here, Nieves has

offered no evidence showing that he suffered an injury due to AvalonBay's failure to supervise

him.  As Nieves has failed to raise any issues of material fact as to his negligent supervision

claim, AvalonBay is entitled to judgment as a matter of law on this claim.

### E. WRONGFUL TERMINATION

In the Fifth Count of his Complaint, Nieves purports to state the Connecticut common

law claim of wrongful termination in contravention of public policy.  Nieves has also abandoned

this claim. In Section II.D. the court set forth the standard regarding abandonment and need not repeat it here. (See supra, Section II.D.) Although AvalonBay has moved for summary judgment on all counts of Nieves's Complaint (see dkt. # 21), a review of the argument section of Nieves's memorandum of law in opposition to defendant's motion for summary judgment reveals that there is no legal discussion regarding Nieves's claim of wrongful termination (Count Five). Because Nieves does not address his wrongful termination claim in his "Memorandum in Opposition to Defendant's Motion for Summary Judgment," (see dkt. # 32), the court shall deem it abandoned. As such, AvalonBay is entitled to summary judgment on this claim.

Alternatively, the court finds that Nieves's claim fails as a matter of law. It is well-settled that an at-will employee may bring an action under Connecticut common law for wrongful discharge when the termination of his employment contravenes public policy and he would otherwise be without a remedy. See Burnham v. Karl and Gelb, P .C., 50 Conn. App. 385, 717 (1998); Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643 (1985); Anderson v. Coca Cola Bottling Co. of New York, Inc., 772 F. Supp. 77, 82 (D. Conn. 1991) (citing Magnan v. Anaconda Indus., Inc., 193 Conn. 558 (1984)); Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471 (1980); see also Thomas v. St. Francis Hosp. and Medical Ctr., 990 F. Supp. 81, 90 (D. Conn. 1998); Wilhelm v. Sunrise Northeast, Inc., 923 F. Supp. 330, 336 (D. Conn. 1995). Here, however, Nieves has failed to allege any statutory, constitutionally, or judicially recognized public policy that AvalonBay's actions contravened. Moreover, Nieves is not otherwise without a remedy at law because any claims of discriminatory or wrongful termination are actionable under Title VII and Conn. Gen. Stat. §§ 46a-60(a)(1)-(a)(4), and several other Connecticut statutes. As Nieves has not raised any discernable issues of material fact as these issues,

AvalonBay's motion for summary judgment on Nieves's wrongful termination claim is **GRANTED** on these additional grounds.

## F. CONN. GEN. STAT. § 31-51q

The court finds that Nieves has also abandoned his Section 31-51q claim. In Section II.D. the court set forth the standard regarding abandonment and need not repeat it here. (<u>See</u> <u>supa</u>, Section II.D.) Because Nieves does not address his Section 31-51q claim in his "Memorandum in Opposition to Defendant's Motion for Summary Judgment," (<u>see</u> dkt. # 32), the court shall deem it abandoned. As such, AvalonBay is entitled to summary judgment on this claim.

Alternatively, the court finds that Nieves's Section 31-51q claims fails as a matter of law. Nieves contends that AvalonBay retaliated against him in violation of Conn. Gen. Stat. § 31-51q because AvalonBay terminated his employment in retaliation for speaking at staff meetings and criticizing conduct of the management. Section 31-51q provides,

> [a]ny employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

Conn. Gen. Stat. § 31-51q. As the Connecticut Supreme Court has observed, "Section 31-51q protects from retaliatory discharge an employee who invokes constitutionally guaranteed free speech rights that, in turn, protect statements that address a matter of public concern." <u>Daley v.</u>

Aetna Life and Cas. Co., 249 Conn. 766, 776 (1999).  "Those constitutional provisions safeguard statements made by an employee that address a matter of public concern, but provide no security with respect to statements that address wholly personal matters."  Id. at 778.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record . . . . An employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community." DiMartino v. Richens, 263 Conn. 639, 667 (2003) (citation omitted; internal quotation marks omitted.); see Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir.2003); Daley, 249 Conn. at 784.  "In order to show that constitutionally protected rights are at issue under Sec. 31-51q , a plaintiff must allege that [he] was exercising [his] free speech rights as a citizen with respect to a matter of public concern . . . . The issue to be addressed is not simply whether the subject matter of the employee's complaint touches on a matter of public concern generally; the issue is whether acting as he did, an employee was acting as a citizen attempting to speak out on a public issue, or whether the employee was instead attempting to resolve a private dilemma relating to employment."  Carr v. Devereux Found., Inc., No. CV 95-0067464, 1995 WL 541799, at *1-2 (Conn. Super. Ct. Sept. 6, 1995) (internal quotation marks and citations omitted.)

Assuming arguendo that Nieves's speech was protected, his Section 31-51q claim fails because he has failed to produce any evidence to show his expression of these concerns was a substantial or motivating factor in AvalonBay's decision to discharge him.  See Lowe v. AmeriGas, Inc., 52 F. Supp. 2d 349, 360 (D. Conn. 1999) ("In actions based upon section 31-51q, there must be a causal connection between the disciplinary action against an employee

and the exercise of the constitutional right by that employee."). Here, Nieves has not produced any evidence to show that his statements surrounding the security gate, the mishandling of the incident where the plants were stolen, or his report of the tire slashing incidents were a motivating factor in his discharge. Nor does Nieves offer evidence opposing Lagasse's statement that "I understand that Mr. Nieves claims he made certain complaints to Ms. Meyer during his meetings with her. If so, Ms. Meyer did not convey that information to me and it was not a factor in my decision." (Dkt. # 22, Lagasse Decl. ¶ 9.) Therefore, finding no evidence from which a reasonable jury could conclude that plaintiff's speech entered into the decision to terminate him or that it was a substantial or motivating factor in his termination, the court **GRANTS** summary judgment in favor of defendant on plaintiff's section 31-51q claim.

### III. CONCLUSION

For the foregoing reason, AvalonBay's motion for summary judgment **(dkt. # 21)** is **GRANTED**. Judgment for the defendant shall enter on all counts of the complaint. The Clerk of the Court shall close this file.

**IT IS SO ORDERED** at Hartford, Connecticut, this ___23rd___ day of August, 2007.

**/s/DJS**

_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**